**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SABA BANIE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HORIZON PHARMA PLC, TIMOTHY P. WALBERT, and PAUL W. HOELSCHER,<br><br>Defendants. | **Civil Action No.:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Saba Banie ("Plaintiff"), by her attorneys, except for her own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Horizon Pharma plc ("Horizon" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons who purchased Horizon common stock between March 13, 2014 and October 22, 2015, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against certain of Horizon's executive officers and directors.

2. Horizon is a biopharmaceutical company focused on improving patients' lives by identifying, developing, acquiring or in-licensing, and commercializing medicines that address unmet medical needs, including the treatment of arthritis, pain, inflammatory, and/or orphan diseases both in the United States and internationally. The Company markets nine medicines through its orphan, primary care and rheumatology business units. Horizon markets several drugs, including ACTIMMUNE, BUPHENYL, RAVICTI, RAYOS, KRYSTEXXA, DUEXIS, MIGERGOT, PENNSAID, and VIMOVO.

3. Horizon's current business model involves a combination of aggressive acquisitions and aggressive pricing through its Prescriptions-Made-Easy ("PME") program. Under the PME program, physicians can send their patients' prescriptions through a specialty pharmacy partnered with Horizon and the prescription is then mailed directly to the patient the next day. If the patient's managed care provider rejects the prescription, Horizon provides the product and subsidizes the cost. The PME program was originally put in place for DUEXIS, but was later rolled out to include VIMOVO and RAYOS.

4. On January 12, 2015, Horizon announced the execution of a comprehensive plan creating a new organization focused on the PME program which, along with focused representative promotion, was meant to maximize the value of the Company's drug products to drive revenue growth.

5. Throughout the Class Period, Horizon and certain of its officers and directors misrepresented the efficacy and long-term prospects of the Company's business model, particularly as it relates to the PME program, and its ability to maintain sustainable revenue, including the following materially false and misleading statements:

- Horizon's business model was "focused representative promotion, PME-program execution and the maximization of the value of the product are all aligned to drive revenue growth";

- Horizon's business model will "support our ability to execute our strategy of continued product and company acquisitions to expand our commercial critical mass and further enhance shareholder value";

- "[F]orecast net sales of $590 to $610 million and adjusted EBITDA of $235 to $250 million";

- "[U]ltimately net sales will continue to increase as we continue to drive prescriptions"; and

- "[O]utperformance is a testament to Horizon's commercial execution and also demonstrates our ability to enhance the growth of medicines we add to our highly successful commercial model."

6. Unbeknownst to investors, however, Horizon only achieved its growth through aggressive, unsustainable pricing tactics using so-called specialty pharmacies with which the Company has undisclosed relationships. The use of such specialty pharmacies left Horizon vulnerable to regulatory scrutiny and, in fact, Horizon has been subpoenaed by regulators in connection with is business practices. Without the use of specialty pharmacies, Horizon's financial performance would have been negatively impacted and worse than represented.

7. The truth about began to emerge on September 23, 2015 when Express Scripts, the second largest U.S. PMB, published a note to its clients criticizing Horizon's price increases, noting that Horizon, after purchasing the rights to Vimovo and with its own product, Duexis "soon increased the prices on these older products ***more than tenfold***. Akin to a spike in gas and plywood prices just ahead of a hurricane, ***this is profiteering***." (Emphasis added).

8. Upon the news, Horizon's stock price closed down $1.90 per share from $25.52 per share on September 22, 2015 to $23.79 per share on September 23, 2015, or 7.4%.

9. On October 19, 2015, the New York Times released an article criticizing the pricing of Horizon's main drug, DUEXIS, and its PME program and use of specialty pharmacies. As a result of this article, the price of Horizon common stock again declined from a closing share price of $19.07 on October 19, 2015 to close at $15.26 on October 20, 2015, or 20%.

10. On February 29, 2016, the Company announced in its annual report that Horizon had received a subpoena in November 2015 from the U.S. Attorney's Office for the Southern District of New York relating to the Company's use of financial assistance to help patients pay for the Company's drugs, as well as its sales and marketing activities and relationships with pharmacies. Upon the news, the Company's stock price declined $2.63 per share from a closing price of $19.79 per share on February 26, 2016 to a closing price of $17.16 per share, or 13.3%.

## JURISDICTION AND VENUE

11. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

13. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act (15 U.S.C. §78aa(c)) because many of the false and misleading statements were

made in or issued from this District and the Company's common stock trades on the NASDAQ located within this Judicial District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16. Plaintiff Saba Banie purchased Horizon securities as set forth herein and in her certification filed herewith.

17. Horizon, a biopharmaceutical Company focused on orphan drug development, is organized under the laws of Ireland. The Company, maintains its global corporate headquarters at 1 Burlington Road, Dublin 4, D04 C5Y6, Ireland and its U.S. headquarters at Lake Forest, Illinois. Horizon common stock trades on the NASDAQ under the symbol, "HZNP."

18. Defendant Timothy P. Walbert ("Walbert") is the President, Chief Executive Officer ("CEO") and Chairman of the board of directors of Horizon.

19. Defendant Paul W. Hoelscher ("Hoelscher") is the Executive Vice President and Chief Financial Officer ("CFO") of Horizon.

20. Defendant Robert J. De Vaere ("Vaere") served as CFO and Executive Vice President of Horizon from March 2010 until September 2014.

21. Walbert, Hoelscher and Vaere are collectively referred to herein as the "Individual Defendants." Horizon and the Individual Defendants are collectively referred to herein as "Defendants."

## CONTROL PERSON ALLEGATIONS

22. By reason of the Individual Defendants' positions with the Company as executive officers (and in Walbert's case, as Chairman of the board as well) the Individual Defendants possessed the power and authority to control the contents of Horizon's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## COMPANY BACKGROUND AND AGGRESSIVE BUSINESS MODEL

23. Horizon is a specialty biopharmaceutical company that focuses on identifying, developing, acquiring and commercializing treatments for arthritis, pain and inflammatory diseases. Horizon's lead products include ACTIMUNE, used to reduce the frequency and severity of serious infections caused by chronic granulomatous disease; DUEXIS, used for the relief of signs and symptoms of rheumatoid arthritis and osteoarthritis; VIMOVO, a nonsteroidal anti-inflammatory drug used to reduce inflammation, pain, and fever; and PENNSAID, used for the treatment of osteoarthritis of the knee.

24. Horizon has adopted an aggressive pricing practice which has pushed Horizon's shares up 180% this year, compared to the average 22% ride for the NASDAQ index of health care

stocks. The Company targets specialty drugs and orphan drugs for rare conditions because these types of drugs fetch higher prices and face little competition. The Company obtains these drugs either through acquiring companies, which already market the drug, developing new drugs, or finding new conditions which can be treated by their already-existing drugs.

25. Once Horizon obtains these new drugs, the Company then significantly increases the pricing of its products.

26. For example, in November 2013, the Company acquired the US rights to VIMOVO from AstraZeneca AB for $35 million. Shortly thereafter, the Company began selling VIMOVO at an inflated price of $799 per prescription, up from its prior price of $199 per prescription. .

27. In March 2014, the Company acquired Vidara Therapeutics International Ltd. ("Vidara") for $660 million, obtaining the rights to the drug ACTIMMUNE. Since acquiring ACTIMMUNE, Horizon has raised the price 66% to $3,300. In a press release on March 19, 2014, Horizon President, CEO and Chairman of the board of directors, Defendant Walbert, stated:

> The addition of ACTIMMUNE complements our commercial business model focused on targeted promotion to primary care physicians and specialists. The combined company would have a portfolio of four proprietary products and an international platform that builds on our strategy of organic growth and acquisitions. We look forward to working with the Vidara team to bring our companies together to accelerate the creation of shareholder value.

28. In October 2014, Horizon announced another acquisition, this time for the US Rights to PENNSAID from Nuvo Research Inc., for $45 million. Since this acquisition, Horizon has increased the price of PENNSAID 515%.

29. Most recently, on May 7, 2015, Horizon announced the successful acquisition of Hyperion Therapeutics, Inc. for $1.1 billion. This acquisition included two drugs, RAVICTI and BUPHENYL. Horizon then increased the price of RAVICTI by 20%, effective July 1, 2015, just

over one month after it was acquired. In the press release, Individual Defendant Walbert stated in relevant part:

> This is a transformational transaction for Horizon Pharma and adds two important medicines, RAVICTI and BUPHENYL, which will help strengthen our orphan business and set the foundation for continued growth. Above all else, Horizon Pharma is a 'patients first' company -- so our goal through the integration of these medicines into our portfolio is to ensure continued access for the patients receiving treatment and the physicians who treat them.

30. In a 10-Q for the period ended June 30, 2015, and filed with the SEC on August 7, 2015, Horizon announced additional price increases it had made for the year on several of its drugs -- effective January 1, 2015, Horizon increased the price for both DUEXIS and VIMOVO by 35.8%, for RAYOS by 28.0% and for ACTIMMUNE by 9.0%. In addition, effective June 1, 2015, Horizon increased the price for ACTIMMUNE by 20% and effective July 1, 2015, Horizon increased the price for each of DUEXIS, VIMOVO and PENNSAID 2% by 6.2%.

31. This aggressive pricing practice has resulted in the loss of the Company's Medicare, Medicaid, and cash business. However, the Company has implemented ways to offset these losses by targeting the commercial insurance businesses and having its sales representatives actively promote its drugs in this business sector. Horizon also offsets the higher cost of the drugs, which may deter many patients from filling prescriptions for its drugs, by investing heavily in a co-pay assistance program.

32. Horizon also offsets losses from federal healthcare programs through its automated distribution system, PME. Under the PME program, physicians can send their patients' prescriptions through a specialty pharmacy partnered with Horizon through a variety of methods including on electronic mobile devices, e-prescribing system, or fax. The prescription is then mailed directly to the patient the next day. If the patient's managed care provider rejects the

prescription, Horizon provides the product and subsidizes the cost. The PME program was originally put in place for DUEXIS, but was later rolled out to include VIMOVO and RAYOS.

33. On July 28, 2014, Horizon announced it was verbally notified by two pharmacy-benefit mangers ("PMBs"), CVS Caremark ("Caremark") and Express Scripts ("ESI"), that two of the Company's drugs, DUEXIS and VIMOVO, would no longer be on their formularies and placed on their exclusion lists effective January 1, 2015. Horizon estimated this would impact approximately 20-30% of DUEXIS and VIMOVO prescriptions. Together, these two drugs represent approximately 92% of the Company's net sales. In response to the verbal notification, the Company stated it would immediately accelerate its patient and physician focused commercial model to focus prescriptions through other channels such as its PME program and evaluate price increases.

34. Unbeknownst to shareholders, however, Horizon's growth strategy, which includes aggressive acquisitions and aggressive pricing through the PME program, is an unstable business model and has caused the Company to report unsustainable revenues. Horizon's predatory business model has resulted in pharmacies, like Caremark and ESI, excluding Horizon's drugs from their formularies, and commercial insurance companies refusing to pay for Horizon's highly-priced drugs. Moreover, the continual acquisition of new drugs has also resulted in high debt for the Company, which debt load has more than tripled to $1.3 billion in the past year alone, and will only continue to grow as Horizon continues its aggressive strategy.

**DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS**

35. On March 13, 2014, Horizon filed its Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K stated in relevant part:

> PME is a novel program that we have developed to address the impact of pharmacies switching from branded products prescribed by doctors to substitute products. In the fourth quarter of 2013, approximately 27% of DUEXIS prescriptions were processed through the three partner pharmacies that are contracted to run the PME pharmacy services. The three partner pharmacies are geographically located on the east coast, in the midwest and on the west coast. Physician offices can access PME either through electronic prescribing systems or a simple fax form that is linked to one of the partner pharmacies. Then, within four hours, the partner pharmacy places a call to the patient and the prescription is shipped overnight to the patient's home. We have initiated this program for DUEXIS, VIMOVO and RAYOS. Over 85% of prescriptions submitted through the PME program are filled and sent to the patient. In comparison, approximately 62% of prescriptions written at retail pharmacies are filled and received by the patient.

36. The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Walbert and De Vaere, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37. On February 27, 2015, Horizon filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K, the Company stated, in relevant part:

> Another key part of our commercial strategy is to encourage physicians to have their patients agree to fill prescriptions through our Prescriptions-Made-Easy, or PME, specialty pharmacy program, which enables uninsured or commercially insured patients' enhanced access to our products by providing financial assistance to reduce eligible patients' out of pocket costs for prescriptions filled via a PME-participating mail order pharmacy. Through PME, prescriptions for our products are filled by designated mail order specialty pharamacies, with the product shipped directly to the patient. Because the patient out of pocket cost for our products when dispensed through the PME program may be significantly lower than such costs when our products are dispensed outside of the PME program, prescriptions filled through our PME program are therefore less likely to be subject to the efforts of traditional pharmacies to switch a physician's intended prescription of our products to a generic or over the counter brand. We expect that continued adoption of our PME program by physicians will be important to our ability to gain market share for our products as pressure from healthcare payors and PBMs, to use less expensive generic or over the counter brands instead of branded products increases. We believe the continued expansion of our PME program will allow us to largely

> mitigate the potential impact of our products being placed on the exclusion lists implemented by PBMs [pharmacy benefit managers].
>
> . . .
>
> In December 2014, we began execution of a comprehensive plan creating a new organization focused on the acceleration of our PME program to ensure continued growth of our NSAID portfolio in 2015. Through this program, physicians can have their patients' prescriptions for our products shipped directly to the patient. Because the patient out of pocket cost for our products when dispensed through the PME program may be significantly lower than such costs when our products are dispensed outside of the PME program, prescriptions filled through our PME program are therefore less likely to be subject to the efforts of traditional pharmacies to switch a physician's intended prescription of our products to a generic or over the counter brand. We expect that continued adoption of our PME program by physicians will be important to our ability to gain market share for our products as pressure from healthcare payors and pharmacy benefit managers, or PBMs, to use less expensive generic or over the counter brands instead of branded products increases.

38. The 2014 10-K contained signed certifications pursuant to SOX by defendants Walbert and Hoelscher, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39. On January 12, 2015, Horizon announced in a press release a business update on its primary care and orphan drug businesses. In the press release, Defendant Walbert touted the Company's comprehensive plan to continue to provide its products to patients while increasing Company revenue. In relevant part, Defendant Walbert stated:

> We have a unique commercial business model where focused representative promotion, PME-program execution and the maximization of the value of the product are all aligned to drive revenue growth. We are now executing a comprehensive plan to ensure patients maintain access to DUEXIS and VIMOVO when their physicians prescribe them. ***With the acceleration of our PME program, the creation of an innovative retail-PME program and recent pricing action, we are confident we will grow combined net revenues for DUEXIS and VIMOVO in the first quarter of 2015 versus the first quarter of 2014.***

(Emphasis added.)

40. Similarly, on February 27, 2015, the Company filed a Form 8-K with the SEC announcing its full year and fourth quarter 2014 financial results. Therein, the Company announced it was already seeing impressive results in 2015 and raised its 2015 full year guidance from $425 to $450 million to $450 to $475 million in net sales, and from $160 to $180 million to $170 to $190 million in adjusted EBITDA. In relevant part, Defendant Walbert stated:

> We continued our strong momentum in the fourth quarter of 2014 and ended up exceeding our latest net sales and adjusted EBITDA guidance for the year. ***We are also encouraged by the results we are seeing so far in 2015 and, as a result, we are raising 2015 full year guidance to $450 million to $475 million in net sales and $170 million to $190 million in adjusted EBITDA.*** Our projected strong operating cash flows and financial leverage support our ability to execute our strategy of continued product and company acquisitions to expand our commercial critical mass and further enhance shareholder value.

(Emphasis added.)

41. Accordingly, Defendant Walbert continued to tout the efficacy and outlook of the PME program and aggressive pricing plan. These overtly positive representations continued in Form 10-Q's, Form 8-K's, and Company press releases filed or issued throughout the Class Period.

42. For example, on March 31, 2015, the Company filed its Quarter Report on Form 10-Q with the SEC, in which it discussed the increasing success of DUEXIS, stating in pertinent part:

> Net sales increased $15.0 million, or 107%, to $28.9 million during the three months ended March 31, 2015, from $13.9 million during the three months ended March 31, 2014. DUEXIS net sales increased approximately $8.4 million ***as the result of prescription volume growth driven by the expansion of our field sales force and the continued rollout of our Prescriptions-Made-Easy, or PME***, program and increased $6.6 million due to higher net pricing.

(Emphasis added.)

43. On May 8, 2015, the Company filed a Form 8-K with the SEC announcing its first quarter 2015 financial results. Therein, the Company discussed its already successful year and again raised its 2015 full year guidance. In relevant part, Defendant Walbert stated:

> ***Horizon's strong first-quarter 2015 performance reflects the outstanding work of our commercial team as we continue to execute our strategy of accelerating growth through strong commercial performance and expanded access for patients and targeted acquisitions.*** In particular, we're extremely pleased with the first-quarter results of our primary care business unit, where we saw significant outperformance with our launch of PENNSAID 2% as well as strong performance of DUEXIS and VIMOVO. We expect the acquisition of Hyperion, which closed yesterday, to further diversify our product portfolio and enhance our business performance. To that end, today we're raising our full-year 2015 guidance. ***We now forecast net sales of $590 to $610 million and adjusted EBITDA of $235 to $250 million.***

(Emphasis added.)

44. That same day, Defendant Walbert held an earnings call with analysts to discuss the first quarter 2015 financial results and the Company's "significant progress in executing our strategy to accelerate growth through strong commercial performance and targeted acquisitions." In relevant part, Defendant Walbert also stated on the earnings call, *inter alia,* the following:

> In the first quarter of 2015 we increased the percentage of prescriptions of DUEXIS, PENNSAID 2% and VIMOVO being processed through our prescriptions made easy program or PME and we have now achieved penetration of 69%, 63% and 58% of prescriptions respectively.
>
> ***
>
> We continue to expect our primary care products will stabilize at 65% to 75% PME penetration. As we have communicated previously gross to net deductions will increase as we increase PME penetration and ***ultimately net sales will continue to increase as we continue to drive prescriptions.***

(Emphasis added.)

45. Similarly, on June 30, 2015, the Company filed its Quarterly Report on Form 10-Q with the SEC, in which it again discussed the increasing success of DUEXIS, its PME program, and aggressive pricing practices, stating:

> Net sales increased $26.4 million, or 148%, to $44.2 million during the three months ended June 30, 2015, from $17.8 million during the three months ended June 30, 2014. DUEXIS net sales increased $14.5 million as the result of ***prescription volume growth driven by the expansion of our field sales force and the continued rollout of our Prescriptions-Made-Easy, or PME program***, and increased $11.9 million ***due to higher net pricing resulting from price increases*** totaling 75% since the second quarter of 2014.

(Emphasis added.)

46. On July 20, 2015, Horizon announced in a press release that it had exceeded its record net sales results and financial expectations for the second quarter. The Company estimated net sales from $170 to $172 million for the second quarter of 2015, an increase of approximately 160% compared to the second quarter of 2014, and an increase of approximately 50% compared to the first quarter of 2015. Accordingly, the Company updated its full year 2015 guidance from $590 to $610 million, to $660 to $680 in net sales, and from $235 to $250 million, to $265 to $280 million in adjusted EBITDA. In relevant part, Defendant Walbert stated:

> Our expected second quarter sales results significantly exceed expectations, driven by rapidly accelerating prescription growth in our primary care and specialty business units and the continued addition of new patients to ACTIMMUNE® and RAVICTI®. ***This outperformance is a testament to Horizon's commercial execution and also demonstrates our ability to enhance the growth of medicines we add to our highly successful commercial model.***
>
> ***Our anticipated results and the increase in our sales and adjusted earnings guidance should provide additional confidence to both Horizon and Depomed shareholders that a combination of the companies would create substantial immediate and long-term value.***

(Emphasis added.)

47. The financial success of the second quarter was further solidified when, on August 7, 2015, the Company filed a Form 8-K with the SEC announcing the record second quarter 2015 financial results. At this time, Defendant Walbert stated: "We delivered exceptionally strong performance in the second quarter and through the first half of the year. Our results significantly

beat expectations on net sales, adjusted EBITDA and adjusted diluted earnings per share. In addition, we're generating strong adjusted operating cash flow and we're well positioned to deliver on our recently raised full-year 2015 net sales and adjusted EBITDA guidance."

48. Finally, on August 7, 2015, the Company also filed its Quarterly Report on Form 10-Q with the SEC. The Company again reported increased net sales of DUEXIS by 148% to $26.4 million for the second quarter of 2015, compared to $17.8 million during the second quarter of 2014. The Company attributed this significant increase to "prescription volume growth ***driven by the expansion of our field sales force and the continued rollout of our Prescriptions-Made-Easy, or PME program***, and increased $11.9 million due to ***higher net pricing resulting from price increases*** totaling 75% since the second quarter of 2014." (Emphasis added.)

49. At all relevant times, the above statements were materially false and misleading when made because Horizon failed to disclose that: (1) the Company has deficient internal controls; (2) Horizon has undisclosed relationships with a network of specialty pharmacies used to boost the Company's sales of high-priced drug products; (3) the use of specialty pharmacies left Horizon vulnerable to regulatory scrutiny and risks; (4) Horizon was under government scrutiny for its financial assistance programs for patients, drug pricing decisions, marketing and distribution of its products; (5) without the use of specialty pharmacies, Horizon's business and financial performance would have been negatively impacted; and, thus, (6) Horizon's business model was unstable and created unsustainable practices and revenues.

## THE TRUTH EMERGES

50. On September 23, 2015, Express Scripts, the second largest U.S. PMB, published a note to its clients criticizing Horizon's price increases, comparing Horizon to Turing

Pharmaceuticals, and noting that Horizon, after purchasing the rights to Vimovo and with its own product, Duexis:

> [S]oon increased the prices on these older products more than tenfold. This isn't innovation.
>
> Akin to a spike in gas and plywood prices just ahead of a hurricane, ***this is profiteering***.

(Emphasis added).

51. Upon the news, Horizon's stock price closed down $1.90 per share from $25.52 per share on September 22, 2015 to $23.79 per share on September 23, 2015, or 7.4%.

52. On October 19, 2015, the New York Times released an article titled "*Drug Makers Sidestep Barriers on Pricing*" criticizing the pricing of Horizon's main drug, DUEXIS, and its PME program. The article specifically referenced Horizon's predatory pricing practices, stating in relevant part:

> The pain reliever Duexis is a combination of two old drugs, the generic equivalents of Motrin and Pepcid.
>
> If prescribed separately, the two drugs together would cost no more than $20 or $40 a month. By contrast, Duexis, which contains both in a single pill, costs about $1,500 a month.
>
> Needless to say, many insurers do not want to pay for Duexis. Yet sales of the drug are growing rapidly, in large part because its manufacturer, Horizon Pharma, has figured out a way to circumvent efforts of insurers and pharmacists to switch patients to the generic components, or even to the over-the-counter versions.
>
> It is called "Prescriptions Made Easy." Instead of sending their patients to the drugstore with a prescription, doctors are urged by Horizon to submit prescriptions directly to a mail-order specialty pharmacy affiliated with the drug company. The pharmacy mails the drug to the patient and deals with the insurance companies, relieving the doctor of the reimbursement hassle that might otherwise discourage them from prescribing such an expensive drug.
>
> * * *
>
> Horizon has increased the price of Duexis about tenfold since the drug was introduced in late 2011. In 2013, it acquired the main competitor to Duexis, a drug called Vimovo, which is a combination of the pain reliever naproxen and the

> stomach protector Nexium. Horizon immediately raised the price of Vimovo about 600 percent, and has roughly doubled it again since then, so both drugs now cost about the same amount per month.
>
> Geoff Curtis, a spokesman for Horizon, said the company needed to recoup the $100 million it invested to develop and manufacture Duexis and the $35 million it paid to acquire Vimovo. He noted the low out-of-pocket payments for patients.
>
> * * *
>
> Starting this year, the nation's two largest pharmacy benefit managers, Express Scripts and CVS Health, said they would not pay for Duexis and Vimovo.
>
> Despite that, Horizon said in its regulatory filing for the second quarter, "with the successful adoption of our PME program by physicians," sales volumes for Duexis increased by 72 percent in the first half of this year compared to the first half of 2014. In dollars, sales of Duexis rose 131 percent in the first half to $73.1 million. In the second quarter, 71 percent of Duexis prescriptions and 61 percent of those for Vimovo went through the Prescriptions Made Easy program.

53. As a result of this article, the price of Horizon common stock again declined from a closing share price of $19.07 on October 19, 2015, to close at $15.26 on October 20, 2015, or ***20%***.

54. On October 22, 2015, Depomed, Inc. ("Depomed"), a pharmaceutical company which had recently rejected several unsolicited bids by Horizon, issued a statement in response to the numerous media reports surrounding Horizon's business model. In particular, Depomed raised concerns regarding Horizon's aggressive drug pricing practices and use of specialty pharmacies through its PME program. The press release stated, in relevant part:

> NEWARK, Calif., Oct. 22, 2015 /PRNewswire/ -- Depomed, Inc. (DEPO) ("Depomed" or the "Company") today issued the following statement in response to numerous recent reports surrounding Horizon Pharma plc's (HZNP) ("Horizon") business model, in particular concerns raised about aggressive drug pricing practices and Horizon's use of specialty pharmacies:
>
> Depomed's Board unanimously rejected Horizon Pharma's unsolicited exchange offer on September 11, 2015. In Depomed's Schedule 14D-9 filed with the SEC on September 14, 2015, the Company highlighted the Board's reservations about Horizon's business model and strategy, while observing that the nature of Horizon's business model had the potential to lead to significant volatility in the price of

Horizon stock. Importantly, numerous reports in the past days – from major media outlets to the firm that establishes one of the largest drug formularies – have reiterated and validated these serious concerns.

For example:

- A September 23, 2015 note issued by Express Scripts, one of the largest managers of drug formularies, to its clients criticizes Horizon's price increases, comparing Horizon to Turing Pharmaceuticals, and notes that Horizon, after purchasing the rights to Vimovo and with its own product, Duexis, "soon increased the prices on these older products more than tenfold. This isn't innovation. Akin to a spike in gas and plywood prices just ahead of a hurricane, this is profiteering."

- An October 19, 2015 article in *The New York Times* discusses significant concerns about Horizon's Prescriptions Made Easy ("PME") program and notes that Duexis is "a combination of two old drugs, the generic equivalents of Motrin and Pepcid", which "if prescribed separately… would cost no more than $20 or $40 a month", however "Duexis, which contains both in a single pill, costs about $1,500 a month."

As noted in Depomed's September 14, 2015 letter to shareholders:

- **We believe the frequency and magnitude of Horizon's price increases are unsustainable:** Horizon has implemented dramatically high price increases across most of its product portfolio, including increases of over 1,500% for Rayos® and nearly 1,200% for Vimovo® since those products were acquired or launched in 2012 and 2013, respectively. We do not believe these pricing strategies are conducive to building a stable and sustainable company that will create and deliver long-term value for its shareholders.

- **Many of Horizon's drugs have recently been removed from the largest PBMs:** Due to Horizon's dramatic price increases and what, in our view, is a lack of meaningful product differentiation, many of Horizon's drugs have recently been removed from the largest PBM drug formularies and remain on the exclusion lists of the two largest PBMs through 2016. We believe that as Horizon continues to increase the prices of its products well beyond the prices of competitive products, the trend of Horizon products being excluded from drug formularies may accelerate, posing further risks to Horizon's business and long-term prospects.

- **In our view Horizon's Prescriptions Made Easy ("PME") drug discount program has caused significant deterioration to Horizon's realized net sales as a percentage of gross sales ("gross to net"):** Horizon's drug formulary exclusions have resulted in millions of patients not having access to Horizon products through their health insurance plans. Through Horizon's PME

> drug discount program, Horizon covers up to 100% of the cost of its products that are not covered by such plans. Although Horizon believes that the continued expansion of its PME program will allow it to mitigate the impact of the drug formulary exclusions, we believe that Horizon's reliance on PME discounts to generate growth in prescription volumes has caused significant deterioration in Horizon's gross to net for many of its products. For example, the net sales as a percent of gross sales for each of Rayos and Pennsaid® 2% dropped from 60% to 45% and 36% to 27%, respectively, from the first quarter of 2015 to the second quarter of 2015.

> Importantly, and in contrast to Horizon's standard business practices, Depomed believes that each of our products has strong drug formulary access, demonstrates value to insurers as brands to secure coverage and not to be excluded, all while offering patients affordable co-pay access and are priced in line with market leading, branded competitors. In addition, unlike Horizon, less than 2% of the sales volume for Depomed's products, excluding Lazanda, were dispensed through specialty pharmacies. The Company's cancer pain product Lazanda and all other similar drugs are often dispensed through specialty pharmacies in order to secure managed care payment authorization for these highly potent and restricted drugs. The Company also notes that had Depomed's Board allowed Horizon to proceed with its hostile offer, and with the haste insisted upon by Horizon, Depomed shareholders today would be receiving only about $14.00 for each share of Depomed stock.

55. Upon the news, Horizon's stock price closed down $1.70 per share from $14.83 per share on October 21, 2015 to $13.12 per share on October 22, 2015, or 11.5%.

56. On February 29, 2016, the Company disclosed that it had received a subpoena in November 2015 from the U.S. Attorney's Office for the Southern District of New York relating to the Company's use of financial assistance to help patients pay for the Company's drugs, as well as its sales and marketing activities and relationships with pharmacies. The federal investigation raised the possibility that Horizon may have to temper its use of financial assistance programs going forward, which would likely impact the Company's financial assistance programs and, thus, bottom line going forward.

57. Upon the news, the Company's stock price declined $2.63 per share from a closing price of $19.79 per share on February 26, 2016 to a closing price of $17.16 per share, or 13.3%.

## ADDITIONAL SCIENTER ALLEGATIONS

58. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Horizon, their control over, and/or receipt and/or modification of Horizon's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Horizon, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

59. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Horizon's securities and operated as a fraud or deceit on Class Period purchasers of Horizon securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Horizon's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Horizon securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

60. At all relevant times, the market for Horizon's securities was an efficient market for the following reasons, among others:

a) Horizon securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) Horizon filed periodic public reports with the SEC and the NASDAQ; and

c) Horizon regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

61. As a result of the foregoing, the market for Horizon's securities promptly digested current information regarding Horizon from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Horizon securities during the Class Period suffered similar injury through their purchase of Horizon securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

62. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Horizon who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

63. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Horizon securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

64. The members of the Class are so numerous that joinder of all members is impracticable, since Horizon has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ. As of October 15, 2015, Horizon had more than 159,279,247 shares issued and outstanding. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

65. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f) whether the price of Horizon securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of Horizon's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

66. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

67. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

68. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF
## COUNT I
## Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants)

69. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

70. This Count is asserted by Plaintiff on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

71. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Horizon's common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Horizon's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

72. Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Horizon's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

73. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

74. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

75. As a result of Defendants' fraudulent activity, the market price of Horizon was artificially inflated during the Class Period.

76. In ignorance of the true financial condition of Horizon, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Horizon containing the misleading information, purchased or otherwise acquired Horizon's common stock at artificially inflated prices during the Class Period.

77. Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Horizon's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Horizon's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of

Horizon's common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Horizon.

78. Throughout the Class Period, Defendants were aware of material non-public information concerning Horizon fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

79. As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Horizon common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

80. Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

81. During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing

public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

82. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

83. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Horizon's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Horizon's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

84. The Individual Defendants acted as controlling persons of Horizon within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Horizon to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Horizon and all of its employees. As alleged above, Horizon is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

85. As a direct and proximate result of the wrongful conduct of Horizon and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A) Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and her counsel as Class counsel;

(B) Awarding Plaintiff and the members of the Class damages, including interest;

(C) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D) Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: March 9, 2016

/s/ Shannon L. Hopkins

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (SH-1887)
Christa Menge
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Telephone: (203) 992-4523
Facsimile: (212) 363-7171

*Counsel for Plaintiff*

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

I, SABA BANIE, duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed a complaint filed in this action;

2. I did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this litigation;

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary;

4. My transaction(s) in Horizon Pharma plc securities which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto;

5. During the three years prior to the date of this Certification, I have not participated, nor have I sought to participate, as a representative in any class action suit in the United States District Courts under the federal securities laws;

6. I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this class action, except for: (i) such damages or other relief as the Court may award to me as my pro rata share of any recovery or judgment; (ii) such reasonable fees, costs or other payments as the Court expressly approves to be paid to or on behalf of me; or (iii) reimbursement, paid by my attorneys of actual or reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I hereby certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and corrected.

Executed this 9th day of March 2016

SABA BANIE

Saba Banie
Transactions in Horizons Pharma plc ("HZNP") Securities

| Settlement Date of Transaction | Type of Transaction | Quantity | Price Per Security | Cost/Gain of Transaction |
|---|---|---|---|---|
| 3/17/2015 | Purchase | 307 | $22.87 | $7,021.09 |
| 7/24/2015 | Purchase | 163 | $38.78 | $6,321.14 |
| 8/27/2015 | Sale | 1.5597 | $29.07 | $45.34 |